SAVOIE, Judge,
dissenting in part.
I respectfully dissent. I would reverse defendant’s conviction of payroll fraud. I would affirm defendant’s conviction of theft of $500.00 or more but reverse that part of the sentence dealing with restitution.
In its treatment of testimony relative to payroll fraud the majority opinion gives extensive treatment to the testimony favorable to the state but bobtails its treatment of testimony favorable to defendant.
In treating the testimony of defense witness, Pamela Toups, the majority omits the *1139 fact that Ms. Toups also testified that she was working in the Sundown Trailer Park on the occasion when the man began shooting the .22 rifle. She confirmed that the defendant was the first deputy on the scene. She stated that the defendant often drove through the trailer park in the patrol unit, his truck, or his personal car. Ms. Toups testified that she also worked at the Gator Stop for a time and that she did not know the defendant leased the building to Randy Ziegler until after she quit. She testified that, while employed at the Gator Stop, Mr. Ziegler was her boss, not the defendant.
Additionally, Ms. Toups related that a district attorney’s office investigator, David Mosely, and a detective from the Terrebonne Parish Sheriff’s Office, Mr. Bourgeois, had come to her trailer to ask questions about the defendant. She testified that, while writing a statement about the defendant’s activities as a deputy sheriff, one of the investigators stated that the district attorney did not have that much evidence against the defendant and that he did not see that there would be a case against the defendant, to which she replied: “You got [sic] that right.”
. Likewise the majority opinion does not mention that defense witness Mrs. Bert Thibodaux testified that on one occasion, the defendant chased after people riding three wheelers on Deadwood Road in response to her complaint. She testified that they called the defendant to watch their house when they were on vacation and that a neighbor informed her that a patrol unit had turned around in her driveway several times while they were gone. Finally, she testified that the defendant responded every time she called upon him.
The majority made no mention of the testimony of defense witnesses John Diggs, Michael Mclntire or Robert Melan-con. We summarize their testimony as follows: John Diggs, age twenty-two, testified that he was a lifelong resident of Gibson and he had known the defendant all his life. Mr. Diggs testified that his family had called the defendant for assistance in connection with various domestic problems in the past, but they had not needed to call the defendant in the last three or four years. He also testified that the defendant patrolled his neighborhood in a “cop car” and sometimes in his personal vehicle.
Michael Mclntire, age thirty-two, testified that he had known the defendant all of his life and had lived in Gibson for the past three years. He testified that he was an oil company salesman and that he owned McNutts Lounge in Gibson. Mr. Mclntire testified that, since 1984, he had called the defendant approximately six or seven times because his place of business was only about one-half mile from the defendant’s residence and because the defendant always came when he called. Mr. Mclntire explained that the defendant did not make any arrests. Instead, the defendant just handled things “diplomatically.” He testified that the defendant responded to these calls in his patrol unit and in several different personal vehicles.
Mr. Mclntire testified that, on one occasion, a truck had been wrecked in the ditch in front of his lounge. When he went outside to investigate, he saw several black males walking down La. 20 toward the Gator Stop. He called the defendant and informed him of the situation. He also called the State Police and reported the wreck. When the State Trooper arrived on the scene, he ran the license plate humber and discovered that the truck had been stolen. Shortly thereafter, Mr. Mclntire heard over the State Trooper’s radio that the defendant had caught the suspects down the highway attempting to steal a second truck. The State Trooper drove down the highway, and Mr. Mclntire followed in his car. When he arrived, he saw that the defendant had turned the situation over to the State Trooper.
Mr. Mclntire testified that the defendant told him to call anytime he had trouble. He also testified that it was easier to call defendant on the phone than it was to call Constable Gibson. Finally, Mr. Mclntire related that, after a burglary of his business, the defendant took him to identify an allegedly stolen television; but this tele *1140 vision was not the one stolen from his lounge.
Robert Melancon testified that he lived on Deadwood Road in Gibson and had known the defendant for fifty to fifty-five years. He testified that, in December of 1986, he called the defendant to complain that some trappers had broken his fences and were trespassing on his land. Mr. Melancon and the defendant located the trappers, confronted them, and warned them that, if they returned, Mr. Melancon would file charges against them. On another occasion, when a bicycle belonging to Mr. Melancon’s grandson was stolen, Mr.. Melancon located part of the bicycle and called the defendant. Apparently, the boy who took the bicycle had disassembled it. The defendant made the boy admit that he had stolen the bicycle. The boy was taken to Houma, and the bicycle was reassembled and returned to Mr. Melancon’s grandson.
Mr. Melancon testified that he owned a considerable amount of land and experienced numerous problems with trespassers. He testified that he had called upon the defendant several times to complain about such problems. He also called the defendant about some boys who were racing up and down Deadwood Road at night. Mr. Melancon testified that the defendant always returned his calls and investigated his complaints. Finally, he testified that he saw the defendant wearing a badge and driving the patrol unit in many different locations.
I note also that the majority’s treatment of Myra Oyer’s testimony omits the fact that her husband had been a part-time deputy sheriff and occasionally went patrolling with the defendant in the Schriever area.
State rebuttal witness David Mosely admitted that his earlier statement that his investigation revealed no law enforcement work done by the defendant had been inaccurate because Ms. Toups had indeed informed him of law enforcement duties performed by the defendant. On redirect examination, Mr. Mosely testified that he personally was not aware of any law enforcement duties performed by the defendant.
As to the rebuttal witness James Brown, the majority failed to include Brown’s testimony that he was employed as a car salesman and owned a used car business while also working as a part-time deputy. When he worked as a part-time deputy, the hours and days of his shift varied. He testified that he sometimes worked five days a week as a part-time deputy sheriff, but other weeks he only worked one or two days. On redirect examination, Deputy Brown explained that, when he worked as a part-time deputy, he was paid by the hour. Therefore, if he did not work as a deputy during the week, he was not paid.
Likewise on cross-examination State rebuttal witness Vince Bourgeois stated that, as the helicopter departed from the scene of the August, 1986, traffic accident, the defendant drove past in his patrol unit. When the defendant complained about the dust stirred up by the helicopter, he also stated that he was on his way to investigate something on the other side of the bridge. Mr. Bourgeois also explained that the defendant was asking him to testify about an accident which had occurred in front of the defendant’s service station during the period of time Mr. Bourgeois was employed by the defendant. Mr. Bourgeois admitted that the defendant had come to ask him if he had witnessed the accident and if he would testify about it; but, since he had not witnessed the accident or heard about such an accident, he informed the defendant that he would not testify.
A review of the testimony of all of the witnesses reveals numerous contradictions. It is well established that the trier of fact may accept or reject, in whole or in part, the testimony of any witness. Furthermore, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Richardson, 459 So.2d 31, 38 (La.App. 1st Cir.1984).
However, I believe that the instant case involves more than a mere witness credibility issue. The State was required to prove that the defendant had committed public *1141 payroll fraud. The State did not contend that the defendant had done absolutely no work as a deputy sheriff. Instead, the State conceded that the defendant had performed some work as a deputy sheriff and proceeded under the theory that the services rendered by the defendant as a deputy sheriff were “grossly inadequate” for the payment or compensation which he received. Therefore, the State was required to prove a negative, i.e., that the defendant did not do enough work as a deputy sheriff to justify his salary. The State attempted to do this through circumstantial evidence.
The statutory rule as to circumstantial evidence is that, assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. LSA-R. S. 15:438. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson v. Virginia, to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Meredith, 536 So.2d 555 (La.App. 1st Cir.1988).
I find that the State's evidence failed to exclude three reasonable hypotheses of innocence. First, the State’s evidence did not rule out the possibility that the defendant patrolled and handled complaints in a manner sufficient to justify his salary. Second, there was a distinct possibility that the defendant performed other law enforcement duties about which the State witnesses had little or no knowledge and that these duties were sufficient to justify his salary. Third, the State’s evidence did not rule out the possibility that the defendant performed some combination of the above duties in a manner sufficient to justify his salary.
The State introduced the testimony of several witnesses to prove that the defendant did not perform work at the motor pool or in marine patrol between July, 1984, and December, 1986. Yet, in conceding that the defendant did perform some work, the State’s evidence forced the conclusion that the defendant did something else. After eliminating the more administrative-type functions performed by some sheriff’s department employees, such as transporting prisoners, collecting taxes, serving papers, working in the jail, etc., the one area of work remaining was that performed by the average deputy, i.e., road patrol and handling of complaints and/or offenses. The State introduced a good deal of testimony that the defendant was not patrolling the Gibson area. Yet, a closer examination of this evidence persuades us that such a conclusion cannot withstand the “beyond a reasonable doubt” standard required for a conviction.
Sheriff Jerry Larpenter testified that he knew of no law enforcement work performed by the defendant. Yet, he also testified that the defendant was not under his direction and did not report to him as Uniform Division Commander. Shift commanders Horace Witt and Willy Radau and assistant shift supervisor General Smith all testified that they never saw the defendant patrol and they knew of no law enforcement work performed by the defendant. Shift commander Ronnie Bergeron knew of only one occasion when the defendant handled a complaint — the incident involving the intoxicated young male firing a .22 rifle at the Sundown Trailer Park. Yet, all of these witnesses testified that the defendant was not under their direction, did not work on their shifts, and did not report to them. Lt. Witt explained that, other than the personnel on his shift, he was not aware of the day to day activities of the other sheriff’s department employees.
Investigator Mosely testified that, as a deputy sheriff, he patrolled the Gibson area. He testified that he knew of no law enforcement work done by the defendant. However, he did not know the defendant personally and lived nine miles from the defendant. On redirect however, Mosely testified that defendant had called in a complaint about a drunk at the Gator Stop and had failed on direct examination to mention the law enforcement activities credited to the defendant by Ms. Toups during his investigation of that incident.
Captain Roy Chauvin testified that he lived in Gibson but never saw the defendant patrol. Officer Silas Theriot testified that, as a deputy sheriff, he patrolled the *1142 Gibson area. He testified that he never saw the defendant’s patrol unit on the streets or at the defendant’s residence. However, neither of these two men knew the defendant. Furthermore, as a Terre-bonne Parish deputy sheriff, Deputy Theri-ot patrolled the Gibson area between October, 1984, and August, 1985. Yet, the defendant did not even receive a patrol unit until May, 1985.
James Williams, the Justice of the Peace in Gibson, testified that he never saw the defendant in his patrol unit. In fact, he testified that he had not seen the defendant for approximately two years. He stated that on one occasion he had seen the defendant’s patrol unit parked at the Gator Stop. However, he admitted that he did not know the defendant lived in a trailer behind the Gator Stop.
Virginia Nevarez and Agent Lynn Lir-ette testified that they never saw the defendant in the patrol unit, but they often saw the patrol unit parked at the defendant’s residence. Constable Lloyd Gibson testified that, in his opinion, ninety percent of the times he observed the defendant’s patrol unit, it was parked at the defendant’s residence; and the remainder of the times when he observed the defendant in his patrol unit, the defendant was not patrolling.
Milton Barrett testified that he occasionally saw the defendant at the motor pool. On most of those occasions, the defendant was in his patrol unit, although the defendant sometimes came to the motor pool in his personal car.
When considering the above testimony, the question arises whether or not the State witnesses who testified that the defendant was not patrolling in the Gibson area were actually in a position to know what the defendant was and was not doing. The defendant explained that he often patrolled in his personal vehicles because the two patrol units assigned to him were old and frequently in need of repair. He testified that, eventually, he left the second patrol unit, Unit 217, parked outside his trailer for its deterrent effect and used his personal vehicles for law enforcement duties.
Vince Bourgeois, the chief of the Gibson Volunteer Fire Department, commented on the amount of dust on the defendant’s patrol unit. Several State witnesses testified that the defendant’s patrol unit was always parked at his residence. Sheriff Larpenter testified that he knew the defendant had been issued two old patrol units and that one broke down and stranded the defendant on the road. He would not deny that an old radio in one of the units would not reach the Courthouse in Houma from Gibson. Mr. Barrett informed Sheriff Ro-zands about the low mileage placed on the defendant’s patrol unit in comparison to other patrol units. However, he explained that the other units were often used twenty-four hours per day by three different shifts. The testimony of these witnesses might be viewed as corroborating the defendant’s testimony about his old, unreliable patrol units.
Many State witnesses testified that the defendant did not work at the motor pool or in marine patrol, although the records indicated that he was assigned to those departments. The defendant explained that he did not check the records and never knew that he was listed in those departments. However, he did testify that he used his personal boat to patrol the Gibson area. He testified that the boat had sheriff’s office decals and was equipped with a radio.
“Zip” Robichaux testified that he had seen the defendant’s boat oncé or twice, although he could not recall whether or not it had sheriff’s office decals on it. Constable Gibson testified that he was not aware of any water patrol duties performed by the defendant, although he admitted that the defendant might have done so without his knowing about it. Finally, two of the seven offense reports credited to the defendant by the State involved a camp burglary and a report of loose barges blocking a canal. One logical conclusion would be that the defendant used his boat to investigate these two matters. While it was not positively established that he did *1143 so, the State certainly did not prove that the defendant did not use his boat when investigating and reporting these matters.
Some of the evidence introduced at the trial suggests that the defendant might have performed duties other than patrolling and handling complaints in the Gibson area. Several State witnesses testified that they had seen the defendant at the Sheriffs office or at Sheriff Rozands’ farm. Sheriff Larpenter testified that the defendant occasionally made short visits to the office and talked with “Zip” Robichaux or himself. He also testified that he saw the defendant at Sheriff Rozands’ farm. “Zip” Robichaux saw the defendant conversing with Sheriff Rozands both at the office and the farm. However, he did not know the nature of those conversations. Mr. Barrett testified that he periodically saw the defendant at the Sheriff’s office and at Sheriff Rozands’ farm. Both Ms. Nevarez and Lt. Bergeron testified that they occasionally saw the defendant at the Sheriff’s office.
There is no evidence to contradict the defendant’s testimony that he reported only to Sheriff Rozands and took orders and instructions only from him. Furthermore, the above testimony that the defendant was seen talking with the Sheriff at the office and farm would tend to corroborate the defendant’s testimony on this point. It is indeed possible that the defendant was to report directly to Sheriff Ro-zands and follow his instructions and that other Sheriff’s Department employees might not have known anything about the defendant’s duties and/or whether or not the defendant performed such duties.
For instance, Mr. Barrett testified that the defendant and Sheriff Rozands occasionally traveled to Baton Rouge together to attend law enforcement meetings, although he also testified that the defendant and Sheriff Rozands went on hunting trips together. “Zip” Robichaux stated that the defendant occasionally traveled out of town with Sheriff Rozands. Although Sheriff Larpenter testified that he never saw the defendant go anywhere with Sheriff Ro-zands, the testimony of Messrs. Barrett and Robichaux directly contradicts the testimony of Sheriff Larpenter on this point. Furthermore, while Sheriff Larepenter characterized “Zip” Robichaux as Sheriff Rozands' “right hand man” and stated that “Zip” Robichaux was the person who usually accompanied Sheriff Rozands on out of town trips, Mr. Barrett testified that “Zip” Robichaux made some trips with Sheriff Rozands, but he was not the Sheriff’s driver. Again, the State’s evidence does not directly contradict the defendant’s testimony that he frequently traveled out of town with Sheriff Rozands during this thirty month period.
Testimony at the trial reveals that between July, 1984, and December, 1986, the average road patrol deputy received a salary of $855.00 per month. The defendant received a salary of approximately $625.00 per month. The average road patrol deputy worked a forty hour week consisting of five, eight hour shifts. Therefore, noting the difference in salary between the average road patrol deputy and the defendant, it seems reasonable to conclude that, if the defendant’s job was to patrol and handle complaints in the Gibson area, he would not have been required to work a forty hour week to justify the lesser salary which he received. Another reasonable conclusion is that, because the defendant was paid differently than the average deputy, his duties might have differed from those of the average deputy. After a careful review of the record, we believe that a rational trier of fact, viewing all of the evidence as favorably to the prosecution as any rational fact-finder can, could not have concluded that the State proved beyond a reasonable doubt that the defendant was guilty of public payroll fraud. See State v. Mussall, 523 So.2d 1305 (La.1988). Therefore, the defendant’s conviction of public payroll fraud should be reversed.
I would affirm the conviction of theft of $500.00 or more. However, that part of the sentence ordering the payment of restitution as a condition of the defendant’s probation should be vacated. The trial court ordered the defendant to pay restitution to the Terrebonne Parish Sheriff’s Office in the amount of $4,101.61. Although *1144 I find the evidence sufficient to support the defendant’s conviction of theft of $500.00 or more, I do not find that the State proved a theft of $4,101.61. The majority of the gasoline credit card purchases made by the defendant were at locations inside Terre-bonne Parish. In light of my conclusion that the evidence was insufficient to support the defendant’s conviction of payroll fraud, I must also find that the State did not prove a theft of the entire $4,101.61. This Court is not charged with a fact-finding duty and therefore should not have to determine the exact amount of the theft which the evidence proves. For guidance, however, the amount of such restitution should be set in an amount between $540.00 and $721.00.